## FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**BART M. BETTEAU**
Betteau Law Office
New Albany, Indiana

ATTORNEYS FOR APPELLEE:

**APRIL F. WILLIAMS-SHAW**
DCS Local Office in Clark County
Jeffersonville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE MATTER OF A.H. AND S.H., Minor Children, | ) | |
| | ) | |
| V.H., Mother, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 10A01-1302-JM-93 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Vicki L. Carmichael, Judge
The Honorable William A. Dawkins, Magistrate
Cause Nos. 10C01-1301-JM-14, 10C01-1301-JM-15

**August 21, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

V.H. ("Mother") appeals the trial court's order granting Petitions to Interview Children filed by the Indiana Department of Child Services ("DCS"). Mother raises one issue, which we revise and restate as whether the court erred in issuing the order. We affirm.

## FACTS AND PROCEDURAL HISTORY

On January 9, 2013, DCS received a report that Mother was using methamphetamine and heroin on a daily basis when her children, four-year-old K., six-year-old A.H., and eight-year-old S.H., were present, that Mother was selling prescription drugs and heroin, and that there were syringes all around the house. Brandy Terry, a DCS family case manager, reviewed the allegations against Mother on January 10, 2013.

On January 11, 2013, Terry visited Mother at her home, explained to Mother the nature of the report, observed Mother's home, and interviewed Mother. Mother stated that she was not using drugs, methamphetamine, or heroin and that she had prescription drugs that she was using for health conditions. Mother stated that she had no history of drug abuse. She submitted to a drug screen, and the results "were that she was negative for all drugs except those that she was prescribed." Transcript at 19. Terry asked Mother to confirm that S.K. was the father of S.H., and Mother did so and then told Terry that S.K. had made a false allegation to DCS about her in the past and that she believed that S.K. had made the current report as well. Terry walked through every room of Mother's house and did not observe any indication of illicit drug use or sales in the home such as pills, a pipe, manufacturing equipment, or distinctive odors. Terry also did not observe any indication that Mother was impaired or under the influence of drugs. Four-year-old K. was present while Mother was interviewed by Terry, but Terry did not interview the

2

child due to his age, and she observed that K. appeared happy and healthy. Terry asked Mother to sign a safety plan, and Mother did so, which provided that Mother agreed to remain sober and drug free while providing care for the children, not to use, sell, or manufacture illegal drugs, and to take any prescription drugs only as directed.

Terry informed Mother that, as part of the assessment, she needed to speak with A.H. and S.H., who were in school at the time. She asked for Mother's permission to speak with the children; however, Mother did not give permission to speak with them, stated that she wished to speak with her attorney, and indicated that the children had "been through a lot of things like this before and . . . [she] did not wish to do any further damage to the children." Id. at 48. At some point, Terry also spoke with the father of A.H., who informed Terry that Mother had a history of drug abuse, that he was not sure if Mother was currently abusing, and that he had not seen Mother for six to nine months. On January 14, 2013, Mother called Terry and indicated that she did not want the children to be interviewed.

On January 25, 2013, DCS filed separate petitions to interview A.H. and S.H. On February 1, 2013, the court held a hearing on the petitions, at which Mother verbally moved to dismiss DCS's petition and the parties presented evidence and arguments. Mother, by counsel, agreed that Ind. Code § 31-33-8-7 permitted an assessment which included an interview of the children. However, Mother argued that the statute is unconstitutional pursuant to the Due Process Clause of the Fourteenth Amendment. When asked if it was her training and experience to be able to observe if a person uses methamphetamine and heroin on a daily basis, Terry responded affirmatively, and when asked whether the evidence she observed during the home visit "not only [did] not []

3

substantiate [the allegations], but that it was a big lie," Terry answered "[a]t that point." Id. at 44. Mother testified that she had reason to believe that S.K. might file a false accusation against her, that S.K. does not pay his child support and does not have visitation, and that she is pursuing court action for back child support. At the conclusion of the hearing, the court took the matter under advisement.

On February 6, 2013, the court entered an Order Granting Request to Interview Children which provided in part:

> [Mother] asserts, compellingly, that her [F]ourteenth Amendment right to direct the upbringing of her children should outweigh [DCS's] intrusion into her life. Certainly, she does have the fundamental right to raise her child without undue state intervention, but that right is not absolute. Where significant compelling interests exist, such as protecting the welfare of children, the state has the power to intervene under its *parens patriae* power. This certainly is the mechanism codified in IC § 31-33-8-7(d). As such, [DCS], by clear statutory authority, must issue a report on the conditions of the children. In this case, [DCS] has a compelling interest, and has no other means to directly assess the conditions of these children without an interview . . . .

Appellant's Appendix at 17-18. The court required Mother to produce A.H. and S.H. for interviews within ten days of the order and permitted Mother to be present for the interviews. Mother filed a motion to stay interview pending appeal, which DCS opposed and the court denied. Mother now appeals.

## ISSUE AND ARGUMENTS

The issue is whether the trial court erred in granting DCS's Petitions to Interview Children.[1] Mother contends that the order compelling her to surrender her children for

---

[1] The dissent's position is that the issue is moot in light of the trial court's refusal to grant a stay pending appeal. However, given the brief amount of time, twelve days, between the court's order denying the stay and the Notice of Appeal, the fact that DCS does not claim that the issue is moot, the

4

interrogation was contrary to due process of law. She argues that she was deprived of her right to due process because the relevant statutory scheme, Ind. Code § 31-33-8-7, interferes with her right to raise and protect her children in the absence of fair procedures and that "[e]ven though the initial report was proved false, [DCS] invoked the statutory procedure to compel [her] six and eight year old children to be interrogated." Appellant's Brief at 8. Mother maintains that "[t]his case clearly shows that to grant such a petition, although permissible under the relevant statutes, is contrary to a parent's right to due process." Id. at 9. Specifically, Mother argues that due process requires the presence of additional procedural protections prior to compelling child interrogation. She asserts that the private interest involved in this case of a parent preventing the damage which would be caused by an interrogation is extremely significant, and Mother acknowledges that the State has an interest in protecting children from parental neglect or abuse.

Mother further argues that, in considering the risk of error created by the challenged procedure, analysis of the relevant statutory scheme shows that it permits compelled interrogation in cases where there is no concern of danger to a child and in violation of the due process guarantee. It is her position that the lack of a verification requirement creates a risk of error, and that the lack of a requirement that a petition include a factual basis establishing child abuse or neglect also creates a risk of error. She maintains that her "right to raise / protect her child should not give way . . . where the true facts conclusively demonstrate that no abuse or neglect is taking place," and that "[t]he State has no interest in interfering with her rights as a parent in such a situation."

lack of evidence in the record indicating that the interview has occurred, and this Court's preference for deciding cases on their merits, we address the issue as briefed and presented to us on its merits.

5

Id. at 13.  Mother states that the deficiencies of the statutory scheme become apparent when compared to actions alleging a child is a child in need of services ("CHINS") generally, that in a CHINS action the coercive intervention of the State is not permitted until a trial court is satisfied that a factual basis exists to warrant such intervention, and that a CHINS petition must be verified, approved by the court, and contain sufficient evidence demonstrating that a child is being abused or neglected.

Mother asserts that, for the statutory scheme to pass constitutional muster, DCS's petition must contain evidence under oath demonstrating that a child is being abused or neglected, that if the factual basis rests upon hearsay the petition should establish the credibility of the source or corroborate the information in some manner, and that the adequacy of the factual allegations must be determined by a neutral, detached magistrate at a hearing.  Mother maintains that this is the only way to ensure that parents are protected from malicious false reports or overzealous departments.

DCS maintains that the court did not deny Mother's due process rights, that DCS made Mother aware of the allegations, that Mother was afforded notice of the court's hearing on the petitions to interview, and that the court conducted a hearing where Mother was provided an opportunity to be heard at a meaningful time and in a meaningful manner.  DCS argues that Mother has a right to raise the children and DCS has a compelling interest in protecting children, that DCS only wanted to interview, not interrogate, the children, and that the provisions of Ind. Code §§ 31-33-8 provide that DCS shall initiate an appropriate and thorough child protection assessment and that the assessment may include an interview.  DCS posits that, given that the purpose of the interviews is to assess the allegations, ensure the children's safety, and make a

6

determination as to what actions DCS should take based upon the outcome of the assessment, the additional steps requested by Mother are unwarranted.

DCS further contends that due process does not require a petition under Ind. Code § 31-33-8-7(d) to be verified, and that "[i]n recognizing that a request to interview children is not on the same level of intervention as a CHINS Petition, where DCS is requesting that the court intervene in a families' [sic] life, our General Assembly chose not to include a requirement that a petition filed under Ind. Code § 31-33-8-7(d) be verified." Appellee's Brief at 11. DCS states that its petitions contained sufficient information regarding the need to interview the children, that the language of Ind. Code § 31-33-8-7(e) requires the court to conduct a hearing, that thus the statute affords a parent with due process through this requirement, and that Mother has failed to demonstrate any harm. DCS further maintains that it satisfied its burden under Ind. Code § 31-33-8-7(d) and that the court did not abuse its discretion or err in ordering Mother to produce the children for an interview.

In her reply brief, Mother argues that DCS's brief fails to demonstrate that her due process rights were protected and "reveals the governmental agency's arrogance, a belief that it should be allowed to interrogate children at its whim without any meaningful judicial oversight whatsoever." Appellant's Reply Brief at 1. Mother states that she is required to show only a deprivation of a protectable interest and that she need not show harm. Mother further contends that DCS's protest of her use of the term "interrogation" as opposed to "interview" "reflects a complete callousness as to the right of parents to prevent compelled questioning of their children by governmental agents and to a mother's point of view," that the present statute "permits compelled interrogation

7

whenever [DCS], in its subjective interpretation, feels that an interview is necessary to protect a child," and that "[d]ue process simply cannot condone compelled interrogation to be totally dependent on the whim of a governmental agency." Id. at 2. Mother also asserts that she was not provided with an opportunity to be heard in a meaningful manner and that the court's hearing was not meaningful because the court was statutorily permitted to enter the order even though it was not necessary for protection of the children.

## DISCUSSION

This case involves the ability of the DCS to interview a child as part of an initial assessment in response to a report of child abuse or neglect. Ind. Code §§ 31-33-8 govern the investigation of reports of known or suspected child abuse or neglect. Ind. Code § 31-33-8-1(a) provides that "[t]he department shall initiate an appropriately thorough child protection assessment of every report of known or suspected child abuse or neglect the department receives, whether in accordance with this article or otherwise." At the time of the petitions, Ind. Code § 31-33-8-1(c) provided that "[i]f the report alleges a child may be a victim of child abuse, the assessment shall be initiated immediately, but not later than twenty-four (24) hours after receipt of the report." (Supp. 2009) (subsequently amended by Pub. L. 205-2013, § 339 (eff. Jul. 1, 2013), moving language to subsection (e)). Ind. Code § 31-33-8-6 provides: "The department shall promptly make a thorough assessment upon either the oral or written report. The primary purpose of the assessment is the protection of the child."

With respect to the scope of the assessment and a petition to interview a child, Ind. Code § 31-33-8-7 provides:

8

(a) The department's assessment, to the extent that is reasonably possible, must include the following:

   (1) The nature, extent, and cause of the known or suspected child abuse or neglect.

   (2) The identity of the person allegedly responsible for the child abuse or neglect.

   (3) The names and conditions of other children in the home.

   (4) An evaluation of the parent, guardian, custodian or person responsible for the care of the child.

   (5) The home environment and the relationship of the child to the parent, guardian, or custodian or other persons responsible for the child's care.

   (6) All other data considered pertinent.

(b) The assessment may include the following:

   (1) A visit to the child's home.

   (2) An interview with the subject child.

   (3) A physical, psychological, or psychiatric examination of any child in the home.

(c) If:

   (1) admission to the home, the school, or any other place that the child may be; or

   (2) permission of the parent, guardian, custodian, or other persons responsible for the child for the physical, psychological, or psychiatric examination;

   under subsection (b) cannot be obtained, the juvenile court, upon good cause shown, shall follow the procedures under IC 31-32-12.[2]

---

[2] Ind. Code §§ 31-32-12 relate to a juvenile court authorizing mental or physical examinations or treatment.

9

(d)    If a custodial parent, a guardian, or a custodian of a child refuses to allow the department to interview the child after the caseworker has attempted to obtain the consent of the custodial parent, guardian, or custodian to interview the child, the department may petition a court to order the custodial parent, guardian, or custodian to make the child available to be interviewed by the caseworker.

(e)    If the court finds that:

(1)    a custodial parent, a guardian, or a custodian has been informed of the hearing on a petition described under subsection (d); and

(2)    the department has made reasonable and unsuccessful efforts to obtain the consent of the custodial parent, guardian, or custodian to interview the child;

the court shall specify in the order the efforts the department made to obtain the consent of the custodial parent, guardian, or custodian and may grant the motion to interview the child, either with or without the custodial parent, guardian, or custodian being present.

Ind. Code § 31-33-8-12 provides that "[u]pon completion of an assessment, the department shall classify reports as substantiated or unsubstantiated."

With respect to Mother's argument that Ind. Code § 31-33-8-7 interferes with her right to raise and protect her children and that due process requires the presence of additional procedural protections prior to compelling the interview of a child, this court has noted that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a parent's fundamental right to raise her child without undue interference by the state. In the Matter of G.W. v DCS, 977 N.E.2d 381, 384-385 (Ind. Ct. App. 2012) (citing In re T.H., 856 N.E.2d 1247, 1250 (Ind. Ct. App. 2006)), trans. denied. However, "[t]hat fundamental right is not unlimited . . . because the state has a compelling interest in protecting the welfare of children. When parents neglect, abuse, or abandon their children, the state has the authority under its *parens patriae* power to

10

intervene." Id. at 385 (internal quotation marks omitted and citing G.B. v. Dearborn Cnty. Div. of Family & Children, 754 N.E.2d 1027, 1032 (Ind. Ct. App. 2001), trans. denied). Due process is essentially "the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893 (1976). When determining whether a litigant received proper process, we balance three factors: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." In re J.S.O., 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). As we review and balance these three interests, we recognize that, "although due process is not dependent on the underlying facts of the particular case, it is nevertheless 'flexible and calls for such procedural protections as the particular situation demands.'" Lawson v. Marion Cnty. Office of Family & Children, 835 N.E.2d 577, 580 (Ind. Ct. App. 2005) (quoting In re B.T., 791 N.E.2d 792, 795 (Ind. Ct. App. 2003), trans. denied). The private interest affected by the proceeding of a parent's interest in the care, custody, and control of her child is substantial, and the countervailing factor of the State's *parens patriae* interest in protecting the welfare of a child is also substantial. In re C.G., 954 N.E.2d 910, 917-918 (Ind. 2011).

The statutory provisions set forth above provide requirements and guidance for DCS to undertake a child protection assessment in response to the receipt of a report of child abuse or neglect, and the provisions provide that the assessment must include the conditions of the children in the home. According to the statute, at the stage or point that a report is received by DCS, the report and any allegations made by way of the report have not yet been investigated and are not yet classified as substantiated or

11

unsubstantiated. The determination to classify a report as substantiated or unsubstantiated is made following the completion of the assessment, which may include an interview of the child under Ind. Code § 31-33-8-7(b) and as set forth in Ind. Code § 31-33-8-7(d) and (e). The assessment as described by Ind. Code § 31-33-8-7 is a preliminary process undertaken by DCS following the receipt of a report in order to evaluate or determine whether a basis exists to substantiate the report and which may require action of some nature by the state to protect the child or children. See Ind. Code § 31-33-8-6 (noting that the "primary purpose of the assessment is the protection of the child"). While we recognize the fundamental right of a parent to raise her child without undue interference by the state, we cannot say that due process requires DCS to conduct an assessment or a portion of an assessment in order to obtain information which would provide a basis supporting the accuracy or reliability of the report, prior to interviewing the child or children. Indeed, an interview of the child or children as part of this initial evaluation may provide the information needed for DCS to classify a report as substantiated or unsubstantiated. We cannot say that legislation allowing DCS the ability to interview a child as part of the initial assessment and after obtaining a court order if necessary violates due process. See G.W., 977 N.E.2d at 386 (noting that this court was aware of no constitutional prohibition against the proposed child interview arrangements). Further, as noted above, parents' fundamental right to raise their children without undue interference by the state, and the state's interest in protecting the welfare of children are both substantial, see In re C.G., 954 N.E.2d at 917-918, and we cannot say that the risk of error created by the legislature's chosen procedure in Ind. Code § 31-33-8-

12

7 or the actions of DCS or the trial court in this case is substantial or favor reversal in this case.[3]

In addition, we do not find Mother's argument that the fact that Ind. Code § 31-33-8-7 does not require that a request for a child interview be verified, or include, similar to the initiation of CHINS actions, a basis that abuse or neglect occurred to be compelling. The statutory provisions related to the filing of a petition alleging that a child is a CHINS, found at Ind. Code §§ 31-34-9, provide that DCS must request the juvenile court to authorize the filing of a CHINS petition, see Ind. Code § 31-34-9-1, that the juvenile court shall consider the inquiry "and the *evidence of probable cause* that is contained in the report of the preliminary inquiry or an affidavit of probable cause" and authorize the filing of a petition if the court finds probable cause to believe that the child is a CHINS, Ind. Code § 31-34-9-2 (emphasis added). The CHINS petition must "be verified," contain a citation to the provision of the juvenile law that defines a child in need of services, and contain "[a] *concise statement of the facts upon which the allegations are based*, including the date and location at which the alleged facts occurred." Ind. Code § 31-34-9-3 (emphasis added). A child is a CHINS in part if the child's physical or mental

---

[3] See Phillips v. Cnty. of Orange, 894 F. Supp. 2d 345, 376 (S.D.N.Y. 2012) (noting that "there is no authority to substantiate the Parent Plaintiffs' claim that the in-school interview of [the child], conducted after CPS received a call alleging that [the child] was the victim of sexual abuse, violates their liberty interest in her care, custody, and management"); Hawley v. Nelson, 968 F. Supp. 1372, 1386 (E.D. Mo. 1997) (stating in part that, upon receiving a report of suspected neglect or abuse, the division of family services was required under Missouri law to undertake a thorough investigation, that such a thorough investigation would reasonably include an interview with the child, that in the context of the investigation the failure to secure parents' permission for interviews "protected the state's very strong interests in protecting the child and learning in timely fashion what the child had to relate about the matter," and that "[t]his interest was paramount to the personal interests of the plaintiffs in preventing false accusations"), judgment aff'd, 141 F.3d 1168 (8th Cir. 1998); J.B. v. Washington Cnty., 127 F.3d 919, 925-927 (10th Cir. 1997) (recognizing the importance of both the private and governmental interests, turning to the last factor in the Mathews balancing and examining the procedures used, and stating that given the situation the procedures employed were reasonably calculated to balance the competing interests and to achieve an interview with the child untainted by the parents' influence).

condition is seriously impaired or seriously endangered and the child needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided or accepted "without the coercive intervention of the court." Ind. Code § 31-34-1-1. Under the CHINS statute, among other things, a child may be taken into custody, a parent may enter a program of informal adjustment, and the court may enter a decree ordering supervision of the child by DCS, that the child receive outpatient treatment, that the child be removed from the home, and that the child's parent complete services recommended by DCS. See Ind. Code §§ 31-34-2, -4, -8, 20. In contrast, as mentioned above, Ind. Code §§ 31-33-8 address the investigation of reports of suspected child abuse or neglect and set forth the process to be undertaken by DCS following the receipt of such a report. The assessment described in Ind. Code § 31-33-8-7 may include an interview of the child, and this assessment, including the interview, may provide the information needed for DCS to classify the report as substantiated or unsubstantiated. The extent and nature of DCS's role in completing an assessment under Ind. Code § 31-33-8-7, including a child interview, to determine whether a report is substantiated is clearly distinct from the coercive intervention of DCS on behalf of the state under the CHINS proceedings in Ind. Code §§ 31-34. Further, we cannot say that Mother was not afforded notice of the hearing on the petitions to interview or an opportunity to be heard with respect to the petitions at a meaningful time and in a meaningful manner.

## CONCLUSION

Based upon the record and under these circumstances, we conclude that Mother has failed to establish that the trial court erred in granting DCS's Petitions to Interview

14

Children or that she was denied due process. Accordingly, we affirm the ruling of the trial court.

For the foregoing reasons, we affirm the trial court's order granting the Petitions to Interview Children.

Affirmed.

BRADFORD, J., concurs.

RILEY, J., dissents with separate opinion.

15

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE MATTER OF A.H. and S.H., Minor Children, | ) ) ) | |
| V.H. (Mother), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 10A01-1302-JM-93 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

**RILEY, Judge, dissenting**

I respectfully dissent from the majority's decision to affirm the trial court's order granting the DCS's petitions to interview the minor children as part of an assessment in response to a report of child abuse or neglect. Although the majority analyzes the merits of Mother's claim, I would dismiss the appeal as moot.

An issue becomes moot when it is no longer live and the parties lack a legally cognizable interest in the outcome or when no effective relief can be rendered to the parties. *Indiana High School Athletic Ass'n, Inc. v. Durham*, 748 N.E.2d 404, 410 (Ind. Ct. App. 2001). An actual controversy must exist at all stages of the appellate review, and if a case becomes moot at any stage, then the case is remanded with instructions to

16

dismiss. *Id*. On February 6, 2013, the trial court issued its order, compelling Mother to produce her minor children for interviews within ten days of the issuance of the order. Despite Mother's request, the trial court refused to stay the interviews pending her appeal. In the absence of any evidence to the contrary, I must conclude that the children have been interviewed and no effective relief can be given to Mother.

Although a public interest exception to the mootness doctrine exists, it is not applicable to the instant case. The public interest exception posits that an otherwise moot case may be decided on the merits if the case involves a question of great public importance or interest that is likely to recur. *Id*. at 412. The instant issue is not capable of recurrence as contemplated by the public interest exception. The statutory protection of the welfare of the minor children based on the conditions in the home and on a completion of an assessment is a question of fact that varies from family to family and changes over time. *See* I.C. § 31-33-8-7(a). Although the question may recur in a very generalized setting, no conclusion within the authority of this court can bear on future disputes with respect to a DCS's petition to interview the minor children because a determination of factual circumstances must be made each time a disputed interview is sought. I conclude that the case does not present an issue of great public interest and, therefore, I would dismiss the appeal as moot.

17